NOTICE

Decision filed 02/09/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250121-U

NO. 5-25-0121

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| BARBARA A. SCHNEIDER, by and Through Her Guardian Lynae Vahle, Individually and on Behalf of All Those Similarly Situated, | ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiff-Appellant and Cross-Appellee, | ) ) | |
| v. | ) ) | No. 23-LA-444 |
| CEDAR RIDGE HEALTH AND REHABILITATION CENTER, LLC, | ) ) ) ) | Honorable Kevin T. Hoerner, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge, presiding. |

JUSTICE BOLLINGER delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the dismissal of the complaint with prejudice, where the record demonstrates that the circuit court did not exercise its discretion in determining whether to grant leave to amend the complaint and remand for proper consideration of the amendment request; we affirm the circuit court's denial of the motion to compel arbitration, where plaintiff's husband had no authority to sign the arbitration agreement on behalf of plaintiff, and the arbitration agreement was substantively unconscionable.

¶ 2    Plaintiff Barbara A. Schneider filed a four-count class action complaint against defendant, Cedar Ridge Health and Rehabilitation Center, LLC. In response, defendant filed a combined motion to dismiss pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2022)), as well as a motion to compel arbitration. Following a hearing on

1

both motions, the circuit court dismissed the complaint with prejudice and denied the motion to compel arbitration. Plaintiff subsequently filed a motion to reconsider and for leave to file an amended complaint, both of which were denied. For the following reasons, we reverse the dismissal with prejudice and remand for further proceedings, and we affirm the denial of the motion to compel arbitration.

¶ 3                                      I. BACKGROUND

¶ 4      On April 18, 2023, plaintiff Barbara A. Schneider[1] filed a four-count class action complaint against defendant Cedar Ridge Health and Rehabilitation Center, LLC. The complaint alleged that, for years, defendant engaged in a profit-driven scheme that enticed thousands of residents to its facility and then systematically and knowingly understaffed the facility in violation of the minimum levels of hours of care mandated by the Nursing Home Care Act (NHCA) (210 ILCS 45/1-101 *et seq.* (West 2022)), which led to dangerous, distressing, and grossly unsanitary living conditions for the residents. Plaintiff claimed that defendant failed to ensure an adequate number of staff were present in the facility for each shift to provide necessary care and perform tasks. Plaintiff stated that defendant's insufficient staffing endangered residents because it did not have enough staff to implement residents' plans of care, to monitor residents' conditions, to protect residents from injury, to give basic nutrition and personal care for residents, or to provide safe and sanitary conditions. Plaintiff alleged that nursing home regulations required defendant to provide enough staff with the appropriate skills and credentials for the hours necessary to meet the care needs of every resident and to implement the residents' individual plans of care, citing section 3-

---

[1]The complaint was originally filed by "Jane Doe, #1, by and through her guardian, Jane Doe, #2, individually and on behalf of all those similarly situated." After a motion filed by defendant requesting that plaintiff name the actual parties, plaintiff agreed to and was ordered to file an amended complaint naming the plaintiff. For purposes of simplicity, we will initially refer to the actual plaintiff.

202.2a of the NHCA (*id.* § 3-202.2a) and Title 77, section 300.1210, of the Illinois Administrative Code (77 Ill. Adm. Code 300.1210 (2011)).

¶ 5    Plaintiff asserted that defendant was to "provide at least the *statutory minimum* number of hours of care to: (a) provide 2.5 hours of 'nursing and personal care each day' for a resident who needed 'intermediate care' from qualified professionals[;] (b) provide 3.8 hours of care per day for 'a resident needing skilled care' from qualified professionals[;] and (c) ensure that at least 25% of this care is provided by a licensed nurse (LPN) and at least 10% by a registered nurse (RN)" (emphasis in original), citing section 3-202.05(e) of the NHCA (210 ILCS 45/3-202.05(e) (West 2022)). Plaintiff alleged, therefore, that for a resident who required skilled care, the statutory floor for hours of care that defendant needed to provide was at least 3.8 hours of nursing care (from a CNA, LPN, or RN), of which at least an hour must be from an LPN and at least 0.4 hours must be provided by an RN. Plaintiff claimed that defendant did not provide the staff necessary to care for residents or to meet this statutory minimum staffing level.

¶ 6    It was contended that, each year, defendant submitted to the Illinois Department of Public Health (IDPH) cost reports that indicated the number of residents by the level of care required, the number of hours of resident care for which defendant paid (broken down by staff position/credential), and the average hourly cost of care for each type of staff. Plaintiff alleged that these cost reports confirmed and quantified the residents' experience of neglect resulting from understaffing.

¶ 7    Plaintiff asserted that because of its systemic understaffing, defendant did not meet its legal obligations to provide the requisite level of care required for residents or protect them from the risk of harm, and further that the residents were continuously in danger of falls, pressure ulcers, wounds, infections, weight loss, dehydration, and other medical ailments. Plaintiff alleged that

3

state inspectors documented harm to residents, including failure to avoid falls, hypothermia, and pressure ulcers. Plaintiff claimed that because of the insufficient staffing, defendant (1) did not and could not provide the care necessary and appropriate for residents; (2) failed to provide residents with necessary physical assistance; (3) could not timely respond to resident call light requests; (4) did not meet legal mandates to comprehensively assess residents and develop and update care plans; (5) did not respond to deteriorations in residents' conditions; (6) had staff perform duties outside of their certification and training; and (7) did not provide care "calculated to 'avoid physical harm, mental anguish, or mental illness of a resident.' "

¶ 8       Plaintiff stated that the complaint was brought on behalf of herself as well as other residents who were Medicaid eligible and resided at defendant's facility on or after April 10, 2019. Plaintiff further indicated that the proposed class satisfied the requirements of section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 2022)), that the class exceeded 1,000 persons, and that common questions of law and fact predominated over the individuals.

¶ 9       The complaint included four counts. Count I asserted a claim of breach of contract. Count II asserted a claimed violation of the NHCA (210 ILCS 45/1-101 *et seq.* (West 2022)). Count III asserted a claim based on a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) (815 ILCS 505/1 *et seq*. (West 2022)). The final count alleged unjust enrichment.

¶ 10      More specifically, the breach of contract count alleged that defendant promised to provide adequate care, which would include adequate levels of staffing, and that defendant "routinely and systematically failed to staff the facility with an adequate level of staffing." Plaintiff claimed that this breach damaged plaintiff as it deprived her of the benefit of the bargain for which she paid defendant, and that the "chronic understaffing" placed plaintiff at greater risk of harm.

4

¶ 11 The violation of the NHCA count stated that the Act requires that no resident be "deprived of any rights, benefits, or privileges guaranteed by law, the Constitution of the State of Illinois, or the Constitution of the United States solely on account of his status as a resident of a facility," citing section 2-101 of the NHCA (210 ILCS 45/2-101 (West 2022)). It asserted that pursuant to section 3-601 of the NHCA (*id.* § 3-601), owners and licensees of nursing facilities are liable to a resident for "any intentional or negligent act or omission of their agents or employees" and that pursuant to section 2-107 of the NHCA (*id.* § 2-107) that it was unlawful for nursing facilities or their employees to "abuse or neglect a resident." See *id.* § 2-101. Plaintiff alleged that through defendant's actions, defendant "neglected the residents" in violation of the NHCA and further alleged that this violation caused the residents "grave injuries, distress, actual damages, economic harm, and placed them in grave physical and psychological danger."

¶ 12 Count III alleged a violation of the ICFA and stated that the ICFA prohibited unfair and deceptive conduct. Plaintiff claimed that defendant engaged in unfair practices by luring "hundreds or thousands" of residents to live in its facility and that it collected government money while providing residents with inadequate care. Plaintiff alleged that defendant's "practices are not only immoral and unethical, but unfair and thus unlawful practices that violate the ICFA."

¶ 13 The final count regarding unjust enrichment alleged that defendant obtained a benefit from plaintiff and that defendant failed to provide adequate staffing levels. Plaintiff asserted that defendant was "unjustly enriched at the expense" of plaintiff. In a blanket prayer for relief, plaintiff requested class certification pursuant to section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 2022)) with plaintiff as the representative of the class, injunctive relief, an appointment of a court monitor, monetary damages, punitive damages, reasonable attorney fees, and any other relief the court deemed just.

5

¶ 14    Attached to the complaint as an exhibit was a complaint determination form from the Illinois Department of Health and Human Services (Department). It indicated that defendant had committed several violations of the NHCA. It found that defendant failed to respect the residents' dignity by not timely responding to call lights to address the residents' needs. It noted that one resident, identified as R4, stated, "When I call (for) them, they don't come around, especially on night shift. I punch the button (call light) and they take 4 hours. By that time, I've peed all over myself." This particular resident's roommate, identified as R9, stated, "They come in, turn it off and walk away. Sometimes they say, 'wait until the next shift.' If you need something on night shift, you better just forget it. It takes them a long time to answer the call light, sometimes over an hour. It definitely doesn't make me feel good, I'll tell you that." Another resident, identified as R1, was discussed by her daughter, who stated, "One day I walked in (the Facility) and her (R1's) entire hand was covered in poop because she reached in her diaper." On another occasion, R1's husband went to the facility at 4:30 p.m. and noted that four call lights were on for 20 minutes and that R1 was wet. "He went up to front desk and couldn't find anyone. The halls were empty except the food on the cart."

¶ 15    Another violation discovered by the Department was that defendant failed to provide enough staff to care for and provide services to the residents. It stated, "This failure has the potential to affect all 96 residents living in the facility." The summary finding noted one determination of improper nursing care, two for odors and fumes, two for poor food preparation and quality, one for a lack of staff, and two for inappropriate employee behavior.

¶ 16    In response, defendant filed a combined motion to dismiss pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2022)). Defendant's section 2-619 motion argued that plaintiff did not have standing because plaintiff (and the putative class

6

members) did not sufficiently describe an injury, thus depriving plaintiff of the standing to sue. Defendant stated that in assessing standing in a purported class action, the circuit court must focus upon the named plaintiff's allegations and not the general class she represented. Defendant insisted that plaintiff's injuries were not "distinct and palpable" and that the complaint was void of any factual allegations that plaintiff suffered any injury. The motion also argued that plaintiff could not be awarded injunctive relief under the NHCA because she was no longer a resident receiving care and could not be awarded injunctive relief under the ICFA because defendant did not fall under the category of "trade or commerce" as required by the ICFA.

¶ 17    Defendant's section 2-619 motion further asserted that it had immunity pursuant to Governor Pritzker's executive orders regarding COVID-19. It stated that the Governor issued Executive Order 2020-19, which granted health care facilities immunity from "civil liability for any injury or death alleged to have been caused by any act or omission by the Health Care Facility" in the course of rendering assistance by providing health care services in response to the COVID-19 outbreak. Defendant claimed that as a result, it was immune from liability from April 1, 2020, to June 27, 2020.

¶ 18    Defendant's section 2-619 motion additionally argued that it was immune from liability due to the political question doctrine, because the legislature had delayed the IDPH's enforcement of monetary penalties for understaffing until 2025, and therefore plaintiff could not file suit based on any part of the alleged understaffing. It further contended that plaintiff failed to file a health care affidavit pursuant to the Healing Arts Malpractice Act (735 ILCS 5/2-622 (West 2022)).

¶ 19    Defendant's section 2-615 motion to dismiss argued that plaintiff did not plead a specific physical injury as to the NHCA and ICFA counts. The remainder of the section 2-615 motion attacked plaintiff's ICFA claim for not alleging unfair or deceptive conduct, her breach of contract

7

claim for not alleging damages, and her unjust enrichment claim on the sole basis that the relationship between plaintiff and defendant was governed by an express contract.

¶ 20    On July 28, 2023, defendant filed a motion to compel arbitration and stay proceedings. Its motion argued that, upon admission to defendant's facility on March 7, 2022, plaintiff, through her representative, executed an arbitration agreement that provided for arbitration to resolve any claims. Defendant maintained that the claims brought in the lawsuit fell within the scope of the arbitration agreement and requested that the parties be ordered to attend arbitration. Attached to the memorandum in support of the motion was an arbitration agreement signed by plaintiff's husband as well as a contract between plaintiff and defendant.

¶ 21    On August 25, 2023, plaintiff filed a response to the motion to dismiss and to the motion to compel arbitration. She argued that the arbitration agreement was unenforceable because her husband, the individual who signed the agreement on her behalf, did not have authority to act as her agent with respect to said agreement.

¶ 22    With regard to the section 2-619 motion to dismiss, plaintiff argued that she only needed to "suffer from a violation of her right to receive adequate care to prevent harm" and need not allege more than "risk of actual harm" for standing under the NHCA. She stated that she had pled that defendant intentionally understaffed its nursing home, which placed her at risk of actual harm. She further contended that she was able to demonstrate that she was placed at risk of harm because she was a resident during the period in which the Department found defendant in violation of staffing requirements.

¶ 23    Plaintiff further asserted that she was not a resident at defendant's facility until March 2022, which was beyond the time frame asserted by defendant for its immunity, which was between April 1, 2020, and June 27, 2020. She further contended that immunity did not extend to

8

willful conduct. She argued that the political question doctrine was not intended to limit the residents' ability to bring suit against nursing homes for failing to meet minimum staffing standards. She further asserted that, pursuant to *Eads v. Heritage Enterprises, Inc.*, 204 Ill. 2d 92 (2003), she was not required to file a health care affidavit.

¶ 24 Plaintiff contended that she did state a claim for a violation of the NHCA and that the statute had been amended to allow nursing homes to be liable for statutory neglect in the absence of actual harm. She further asserted that she sufficiently stated claims for a violation of the ICFA, breach of contract, and unjust enrichment.

¶ 25 The motions were called for hearing on June 20, 2024. The parties first argued the motion to compel arbitration. During that argument, in addition to the argument contained in her written pleading, plaintiff argued that the arbitration agreement was substantively unconscionable as it limited damages to $250,000. In further support of that argument, plaintiff cited *Turner v. Concord Nursing & Rehabilitation Center, LLC*, 2023 IL App (1st) 221721. The circuit court took the motion to compel arbitration under advisement.

¶ 26 The parties then argued defendant's motion to dismiss. With regard to whether plaintiff had alleged an injury in the complaint, the following exchange occurred:

"THE COURT: What's your injury? What's the injury? Have you alleged an injury?

MR. TATE: We absolutely have alleged injury.

And so with respect to—first of all, I would like to note that our one—resident one in this survey is Jane Doe number one. I don't know if that was clear in the complaint.

MR. FRANKLIN: It was not.

9

MR. TATE: Okay. We're happy to amend the complaint if the Court would like us to.

* * *

MR. TATE: *** So our client's family members found her on several occasions with feces on her hands and sitting in urine. My client's mental anguish should be very obvious based on the complaint as it should be for anyone who has a family member under the care of a facility like this. I have had family members in care facilities like this, it's extremely anguish for someone to suffer like that. My client's company—my client's family complained about the facility to the IDPH and then the facility was cited by the IDPH specifically for understaffing."

¶ 27    On June 20, 2024, the circuit court granted defendant's motion to identify "Jane Doe" in the complaint and ordered plaintiff to file an amended complaint within seven days without fictitious names. A separate order was entered, taking the motion to dismiss and the motion to compel arbitration under advisement. Both parties were directed to submit proposed orders.

¶ 28    On June 27, 2024, plaintiff filed a first amended class action complaint, naming plaintiff and her guardian as the parties. No substantive amendments were made to the first amended complaint.

¶ 29    On September 25, 2024, the circuit court entered a detailed order regarding defendant's motion to dismiss and motion to compel arbitration. It determined that the arbitration agreement was signed by plaintiff's husband when he had no power of attorney or guardianship over her. It also found that the agreement was substantively unconscionable because it limited recoverable damages. As a result, the circuit court denied the motion to compel arbitration.

10

¶ 30    With regard to the motion to dismiss pursuant to section 2-619, the circuit court found that plaintiff lacked standing because she had not suffered an "injury-in-fact." The circuit court indicated that plaintiff did not allege a distinct and palpable injury, as the injury allegation could not be merely speculative. Further, the circuit court pointed out that plaintiff was discharged from defendant's facility and, therefore, any alleged risk of immediate danger was eliminated. The circuit court further found that any alleged injury was not "fairly traceable" to defendant's actions and that the complaint was completely void "of any attempt to connect the dots between these vague allegations and any distinct, palpable injury they have suffered, or even will suffer."

¶ 31    The circuit court found that plaintiff did not have standing to be awarded injunctive relief or punitive damages under the NHCA, as she was no longer a resident. It found that plaintiff did not have standing to be awarded injunctive relief or punitive damages under the ICFA because the wrong alleged was a "private wrong" and did not affect the general public.

¶ 32    The circuit court found that defendant was immune from suit under the political question doctrine. It indicated that the legislature had stated that nursing homes need not comply with the staffing requirements in the NHCA until at least 2025. It held that plaintiff's complaint should be dismissed because she presented a "nonjusticiable political question."

¶ 33    As to the section 2-615 portion of the motion to dismiss, the circuit court found that plaintiff failed to state a claim for violation of the NHCA and ICFA because she did not suffer any injury. It stated that plaintiff did not claim that defendant engaged in any unfair practice or deceptive conduct. It found that plaintiff did not establish a claim for breach of contract in that she failed to plead that she personally suffered damages. The circuit court found that plaintiff failed to state a claim for unjust enrichment because there was a contract between plaintiff and defendant. As a result of the foregoing, the circuit court granted defendant's motion to dismiss with prejudice. In

11

its dismissal order, the circuit court did not discuss plaintiff's counsel's oral request to amend the complaint at the hearing on the motion to dismiss and did not express any reason for denying that request or not permitting plaintiff to correct the pleading deficiencies cited in its order.

¶ 34    On October 25, 2024, plaintiff filed a motion for reconsideration and for leave to amend. With regard to the circuit court's finding that plaintiff did not allege any specific injury in the complaint, she pointed out that "in her briefing, at the hearing, and in Plaintiff's proposed order, Plaintiff's counsel described the obvious mental anguish suffered by Plaintiff *** as a result of being left unattended while she sat in her own excrement." She further stated that an attached second amended complaint expressly described how the understaffing caused plaintiff's injuries.

¶ 35    Plaintiff argued that the circuit court erred when it found that she could not be awarded injunctive relief under the NHCA and ICFA. She pointed out that her proposed order noted that plaintiff intended to return to the facility because it was closer to family and it would allow her to see them more often. She further indicated that she added this information to the proposed second amended complaint (SAC).

¶ 36    Plaintiff contended that the circuit court erred when it found that she could not plead punitive damages under the NHCA. She pointed out that the authority relied upon by defendant did not address punitive damages, but rather treble damages. She indicated that under the amended NHCA, she may seek punitive damages. She similarly argued that she could claim punitive damages under the ICFA because she alleged that defendant knowingly understaffed its facilities, thereby neglecting and mistreating the residents. She contended that the proposed SAC added additional allegations, including that the "Vice President of Operations (also a co-owner and now CEO) also instructed management to stand by the clock-in machine when hourly staff members reported for work and tell them to go home instead of clocking in" and that "[t]he purpose of this

12

scheme was to make it appear from Cedar Ridge's staffing schedules that Cedar Ridge was trying to keep its facility well-staffed and that staffing shortages were due in part to employees not showing up to work. This is but one example of how Cedar Ridge *intentionally* understaffed its facility." (Emphasis is original.)

¶ 37 Plaintiff further insisted that the circuit court erred by ruling that the political question doctrine immunized defendant. She pointed out that the legislature only delayed the assessment of penalties, and not the actual staffing requirements under the NHCA. She further asserted that an analysis of the six characteristics of cases that are inappropriate for judicial review under the political question doctrine, as defined in *Baker v. Carr*, 369 U.S. 186 (1962), reveals that the political question doctrine did not apply to plaintiff seeking to enforce the NHCA's requirement that defendant provide adequate care.

¶ 38 Turning to the section 2-615 portion of the dismissal order, plaintiff argued that she can allege actual injuries caused by defendant and did so in the proposed SAC. She further argued that she pleaded damages to support her ICFA claim in that she paid for services that she did not receive due to defendant's deception. She stated, "Plaintiff argued that because of Defendant's deceptive conduct, Plaintiff paid for nursing home care and, instead, received neglect because of Defendant's deception and unfair practices. Notably, the means by which Plaintiff paid for these services is immaterial for determining liability; regardless of whether Plaintiff paid by personal funds or by Medicaid, it is ultimately Plaintiff's money that was lost to Defendant as a result of its deceptive trade practices." She indicated that the proposed SAC described defendant's unfair practices of intentionally understaffing its facility by directing management to "stand by the clock-in machine when hourly staff members reported for work and tell them to go home instead of clocking in."

13

¶ 39    Plaintiff asserted that she claimed damages to support her breach of contract claim. She stated that the damages included depriving plaintiff of the benefit of the bargain for which she paid. She further maintained that she should be permitted to plead, in the alternative, a claim for breach of contract and a claim for unjust enrichment. Plaintiff requested that the motion to reconsider be granted and that she be granted leave to file the proposed SAC.

¶ 40    Attached to the motion was the proposed SAC. The SAC expressly alleged that plaintiff was "R1" in the IDPH understaffing citation exhibit that was attached to both the original complaint and the SAC. The SAC recounted experiences of plaintiff's family finding her neglected, highlighted admissions by staff about the foreseeable neglect caused by understaffing the facility, and detailed plaintiff's specific physical, mental, and emotional injuries. With respect to injuries, the SAC alleged that plaintiff contracted very painful urinary tract infections (UTIs) due to defendant's staff ignoring her and allowing her to sit in her own excrement for hours on numerous occasions. These UTIs allegedly caused plaintiff "severe pain in her bladder, groin, lower abdomen, and throughout her pelvis" and "a strong urge to urinate that would not go away, a burning feeling when she urinated, and the need to urinate more frequently." The SAC described how "the frequent experience of sitting in her own excrement for hours caused [her] to suffer severe emotional distress and mental anguish, including feelings of fear, sadness, depression, anxiety, embarrassment, and shame." The SAC alleged these injuries were a direct result of defendant's intentional decision to understaff its facility, which necessarily resulted in fewer staff members to assist residents with going to the bathroom or changing their undergarments or bedding.

¶ 41    The SAC also addressed that plaintiff wished to return to defendant's facility once its understaffing problem was corrected so that she could live closer to her family. Furthermore, the

14

SAC included more facts about defendant's intentional efforts to understaff its facility. The SAC stated that the "Vice President of Operations (also a co-owner and now CEO) also instructed management to stand by the clock-in machine when hourly staff members reported for work and tell them to go home instead of clocking in." The SAC further alleged that "[t]he purpose of this scheme was to make it appear from Cedar Ridge's staffing schedules that Cedar Ridge was trying to keep its facility well-staffed and that staffing shortages were due in part to employees not showing up to work. This is but one example of how Cedar Ridge *intentionally* understaffed its facility." (Emphasis is original.) The SAC also alleged that "[t]hrough this scheme, Cedar Ridge was intentionally and fraudulently misleading the IDPH, federal regulators, residents, residents' families, and the public so that Cedar Ridge's owners could make more profits and enrich themselves by keeping the money they would otherwise pay their hourly workers to care for residents."

¶ 42   The motion for reconsideration was called for hearing on January 20, 2025. During argument, plaintiff's counsel stated:

> "MR. TATE: And I think that what got missed is, and I didn't say this in the hearing, that our client does have injuries and our client suffered tremendously. She had—She suffered, first of all, mental anguish which I mentioned at the hearing from sitting in her own excrement for God knows how long because the facility was understaffed, as we alleged intentionally understaffed. And that was attached to the complaint in a report by the IDPH. And our claimant—Our client was identified as Resident 1 or R1.
>
> And I had mentioned at the hearing that I offered to amend the complaint if the Court would like me to do so. And I would be happy to do that again.

And we've prepared an amended complaint that alleges the injuries more clearly that she is R1. This is her. She is the one who was found sitting in her own excrement by her loved ones when they came to visit her. And this happened frequently, more than once.

In the amended complaint—Well, first of all that's enough under the Nursing Home Care Act. Mental anguish is enough of an injury under the Nursing Home Care Act. However our client had physical injuries from this. She got urinary tract infections that were very painful for her. She's an elderly woman and she had to suffer through those because of the understaffing.

So we have added the facts into this amended complaint. And it's very, very important that those facts see the light of day.

* * *

THE COURT: I'm talking about the allegations about the UTI infection.

MR. TATE: The UTI infection was not in the original complaint, Your Honor.

THE COURT: Or—or—Okay.

MR. TATE: And that's—that's part of what we would like to allege. And so at the hearing I offered to amend the complaint to add more detail and make it clear that she is R1. She is the one that suffered sitting in her own excrement for a long time.

And, you know, frankly we—We felt very strongly that the Nursing Home Care Act's definition of neglect included this kind of injury. I respect you expressed a lot of skepticism at that. I did not expect, Your Honor, that you would dismiss the complaint with prejudice and so that we would not be allowed to add more facts to proceed that way.

And this may just be my fault. This is my first case in Illinois. And I definitely don't want this family to be set back if I've made an error and not pleading more specifically.

16

We have those facts. We are ready to plead those facts, ready to file that amended complaint today if Your Honor would accept it. My counterpart here can bring back other arguments and we can have another, you know, briefing session on a motion to dismiss."

¶ 43 After hearing arguments of counsel, the circuit court took the matter under advisement. On January 31, 2025, the circuit court entered an order denying the motion to reconsider. On February 13, 2025, the order was amended *nunc pro tunc* to indicate that the motion that was denied was brought by plaintiff and not defendant. Neither order set forth any discussion or reasoning by the circuit court in denying plaintiff's request to file a SAC. On February 20, 2025, plaintiff filed a notice of appeal.

¶ 44                                                    II. ANALYSIS

¶ 45 On appeal, plaintiff raises 12 contentions. More specifically, plaintiff argues that the circuit court erred (1) by dismissing the action with prejudice; (2) in finding that plaintiff did not have standing because of no allegation of injury; (3) in dismissing the injunctive relief claims under the NHCA and ICFA; (4) in finding that plaintiff could not plead punitive damages under the NHCA; (5) in finding that plaintiff could not plead punitive damages under the ICFA; (6) in applying the political question doctrine test; (7) when it found that plaintiff did not—and could not—allege an injury to bring a claim under the NHCA; (8) when it found that plaintiff did not—and could not— allege damages or unfair or deceptive conduct under the ICFA; (9) when it found that plaintiff did not allege damages to bring a claim for breach of contract; (10) when it found that plaintiff could not plead an unjust enrichment claim in the alternative to a breach of contract claim; (11) in denying the motion for reconsideration; and (12) in denying plaintiff's motion for leave to file an amended complaint. Defendant filed a cross-appeal, arguing that the circuit court erred in denying its motion to compel arbitration.

17

¶ 46                    A. Defendant's Combined Motion to Dismiss

¶ 47    Defendant filed its motion to dismiss pursuant to sections 2-615 and 2-619. We note that while defendant did not refer to or cite to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)), section 2-619.1 permits a combined motion to be filed utilizing these two sections. "We review the dismissal of a combined motion to dismiss *de novo*." *GPB Stockholder Group, LLC v. Partnership Capital Growth Investors III, L.P.*, 2023 IL App (1st) 211351-B, ¶ 14. "*De novo* review means that we are ' " 'free to undertake [our] own assessment of the facts in relation to the issues.' " ' " *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 25 (quoting *People v. Johnson*, 237 Ill. 2d 81, 88-89 (2010), quoting *People v. Cosby*, 231 Ill. 2d 262, 271 (2008), quoting *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006)). "We perform the same analysis that a trial court would, and we owe no deference to the trial court." *Id.* Accordingly, we will apply this standard in our review of the circuit court's dismissal of plaintiff's complaint based on the lack of standing and consider whether the dismissal was proper as a matter of law.

¶ 48                          B. Section 2-619 Dismissal

¶ 49    Defendant moved to dismiss plaintiff's complaint pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2022)). "The purpose of a motion to dismiss under section 2-619 of the Code of Civil Procedure is to afford litigants a means to dispose of issues of law and easily proved issues of fact at the outset of a case ***." *People v. Philip Morris, Inc.*, 198 Ill. 2d 87, 94 (2001). Section 2-619(a)(9) of the Code provides for a dismissal of the pleading if the claim asserted against the defendant is barred by other affirmative matters avoiding the legal effect of or defeating the claim. 735 ILCS 5/2-619(a)(9) (West 2022). Under section 2-619, the moving party admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter that avoids or defeats the claim. *Brock v. Anderson Road Ass'n*, 287 Ill.

18

App. 3d 16, 21 (1997). "[T]he reviewing court must ascertain whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Carroll v. Paddock*, 199 Ill. 2d 16, 22 (2002).

¶ 50　　In this context, defendant's motion to dismiss pursuant to section 2-619 was filed on multiple grounds. First, defendant asserted that plaintiff had not sustained an injury and therefore lacked standing. Second, it contended that it was immune from all claims from April 1, 2020, to June 27, 2020, pursuant to executive order immunity. Third, defendant claimed immunity based on the political question doctrine. Lastly, it argued that plaintiff failed to submit a health care affidavit in accordance with the Healing Arts Malpractice Act (735 ILCS 5/2-622 (West 2022)). The circuit court did not issue a ruling regarding either the executive order immunity issue or the health care affidavit issue, and neither was discussed by either party on appeal; therefore, these two matters will not be addressed herein.

¶ 51　　　　　　1. *Plaintiff's Injury, Standing, and Request to Amend Complaint*

¶ 52　　We first address the circuit court's finding that plaintiff lacked standing. "Lack of standing is an 'affirmative matter' that is properly raised under section 2-619(a)(9)." *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999). The circuit court dismissed plaintiff's complaint pursuant to section 2-619(a)(9) based on the contention that plaintiff had not suffered an injury-in-fact, and therefore, lacked standing. "Standing in Illinois requires only that the plaintiff demonstrate 'some injury in fact to a legally cognizable interest.' " *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 21 (quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988)). "A legally cognizable interest exists when that injury, whether actual or threatened, is (1) distinct and palpable, (2) fairly traceable to the defendant's actions, and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Id.* " 'The injury alleged by the

plaintiff must be concrete; a plaintiff alleging only a purely speculative future injury or where there is no immediate danger of sustaining a direct injury lacks a sufficient interest to have standing.' " *Id.* (quoting *Petta v. Christie Business Holdings Co.*, 2025 IL 130337, ¶ 18). In a claim seeking monetary damages, the plaintiffs' assertion that they merely faced an increased risk of harm is inadequate to establish standing. *Id.*

¶ 53    The complaint was initially filed as a purported class action, with the named plaintiff remaining anonymous. The original complaint alleged that defendant's inadequate staffing levels resulted in neglect of its residents, thereby placing them at "risk of injury, illness, distress, and deterioration." It further asserted that the staffing deficiencies placed all residents "in continual danger of falls, pressure ulcers, wounds, infections, weight loss, dehydration, and other medical ailments." The complaint alleged that the residents endured harm that was "uncovered by State inspectors" and provided pertinent examples.

¶ 54    During the motion to dismiss hearing, an exchange ensued when addressing defendant's assertion of an alleged absence of injury.

> "THE COURT: What's your injury? What's the injury? Have you alleged an injury?
>
> MR. TATE: We absolutely have alleged injury.
>
> And so with respect to—first of all, I would like to note that our one—resident one in this survey is Jane Doe number one. I don't know if that was clear in the complaint.
>
> MR. FRANKLIN: It was not.
>
> MR. TATE: Okay. We're happy to amend the complaint if the Court would like us to."

20

The circuit court did not respond to or otherwise address plaintiff's counsel's request to amend the complaint and proceeded with the hearing, ultimately issuing a written ruling that granted the motion to dismiss with prejudice. We find this to be error warranting a reversal of the dismissal order with prejudice.

¶ 55 Plaintiff's counsel argued in the circuit court that allegations of risk of harm to plaintiff caused by defendant's alleged staffing neglect were legally sufficient to support plaintiff's claim under the NHCA. During the hearing on the motion to dismiss, the circuit court's questioning made it clear to plaintiff's counsel that an actual injury must be alleged. In response, plaintiff's counsel pointed out that the named plaintiff was R1 as alleged in the complaint and in the exhibit to the complaint and that plaintiff's counsel could amend the complaint to make it clearer that plaintiff sustained an actual injury. Although such a request was made orally and not in writing, oral requests are equally effective. See *Modern Mailing Systems, Inc. v. McDaniels*, 191 Ill. App. 3d 347, 351 (1989); *Goodwin v. Matthews*, 2018 IL App (1st) 172141 (it was not an abuse of discretion for the trial court to grant an oral motion to amend the pleading).

¶ 56 Section 2-616(a) of the Code (735 ILCS 5/2-616(a) (West 2022)) provides that at any time before final judgment, the court may permit amendments on just and reasonable terms to enable the plaintiff to sustain the claim brought in the suit. A request for leave to amend a complaint should be granted unless it is apparent that even after amendment, no cause of action can be stated. *Juhasz v. Hejna*, 139 Ill. App. 3d 35, 38 (1985). The provisions of the Code are to be interpreted broadly to ensure that disputes are resolved in accordance with the parties' substantive rights. See 735 ILCS 5/1-106 (West 2022); *Ruff v. Northwestern Memorial Hospital*, 159 Ill. App. 3d 811, 818 (1987). "We review an order denying a motion seeking leave to amend a complaint using an abuse of discretion standard." *Kay v. Prolix Packaging, Inc.*, 2013 IL App (1st) 112455, ¶ 41.

21

¶ 57    Plaintiff's counsel's oral request during the motion to dismiss hearing, while not articulated with precise clarity, nonetheless clearly expressed plaintiff's counsel's desire that he be given leave to amend the complaint to cure the deficiencies pointed out by the circuit court during the hearing. For example, it has been established that a request constitutes an application to amend a complaint when, during a hearing on a motion to dismiss, counsel tendered the required affidavit and report at issue, thereby evidencing the party's intention to seek leave to amend the complaint. *Bassett v. Wang*, 169 Ill. App. 3d 663, 669 (1988). Similarly, in *McCastle v. Mitchell B. Sheinkop, M.D., Ltd.*, 121 Ill. 2d 188, 193 (1987), the plaintiff's counsel made a statement during a motion to dismiss hearing, indicating that " 'such affidavits could be filed and then made available to the court.' " Although the Illinois Supreme Court regarded the statement as "not as precise as it might be," it nonetheless determined that it "clearly expresses the plaintiff's desire that he be given leave to file an amended complaint." *Id.* at 194.

¶ 58    The statement in *McCastle* closely parallels the statement made by plaintiff's counsel in the present case during the motion to dismiss hearing. Furthermore, in both *McCastle* and *Bassett*, when the circuit court dismissed the cases with prejudice without exercising its discretion to grant leave to amend, the appellate courts remanded the cases for proper consideration of the amendment requests. We agree with these rulings and determine that such relief is appropriate in this case.

¶ 59    Additionally, we observe that a misstatement was made by defendant's counsel during the hearing on the motion to reconsider regarding plaintiff's oral request to amend her complaint when the circuit court did not recollect whether it had discussed and considered whether to dismiss the complaint with or without prejudice. During the hearing on the motion to reconsider, the following exchange took place:

22

"MR. FRANKLIN: Thank you, Judge. I just want to begin first with plaintiff's motion for leave to amend to file a second amended complaint.

Obviously as this Court knows that on September 25, 2024 it entered an order, a 47 page order that went through every allegation, every cause of action in detail and, you know, on certain issues ruled in favor of plaintiff, in plaintiff's favor, and on certain issues ruled in defendant's favor.

That order was entered with prejudice dismissing the first amended complaint. *At no time prior to that did plaintiff ever request orally* or in writing leave to amend to file a second amended complaint.

If this Court will recall this hearing happened on June 20 of 2024. So they had July, August, September, three months, 90 days in order to somehow seek leave to amend if they wanted to after that hearing on June 20 and they did not.

THE COURT: Refresh my recollection on this point. Did I make clear to the parties at least at the close of the hearing regarding the precise form of relief that was being sought by the defendants for example?

It's a practice of mine to try to make clear to tell the Court again what it is you are seeking. Are you seeking dismissal without prejudice or are you seeking dismissal with prejudice.

And it would surprise me if I did not go into that brief discussion.

Do you remember?

MR. FRANKLIN: Your Honor, based off of the transcript that I have in front of me that question was not directly posed but obviously it was discussed in both motions,

particularly my motion indicating that we would like it dismissed with prejudice. And then you requested that both parties submit proposed orders.

THE COURT: Right. Okay.

MR. FRANKLIN: And obviously in defendant's proposed order we requested a dismissal with prejudice.

THE COURT: Okay. Thank you." (Emphasis added.)

¶ 60     In response to the above discussion, plaintiff's counsel stated:

"MR. TATE: I'll respond briefly, Your Honor.

So at the hearing it's on page—the first hearing on page 27, line 10 I said we're happy to amend the complaint if the Court would like us to. I did not make a formal motion but I did say that. And we are happy to.

I truly did not think if there was a dismissal or the Court rejected our theory about risk of harm being enough that the entire case would be dismissed with prejudice."

¶ 61     We find this exchange to be highly informative. First, defense counsel incorrectly informed the circuit court that plaintiff did not seek "either orally or in writing" to amend the complaint, as evidenced by the transcript of the motion to dismiss hearing. This is particularly notable given that defense counsel acknowledged, in the same breath, possession of the transcript. Thereafter, plaintiff's counsel recalled having made the request and pointed out the specific location in the transcript where it was documented. Second, the circuit court expressed surprise that it had not discussed with the parties during the motion to dismiss hearing whether the matter would be dismissed with or without prejudice. The significance of this context is paramount, as it pertains to defendant's argument concerning plaintiff's failure to seek leave to amend the complaint. It is presumed that had the circuit court engaged its "practice" of discussing with the parties about the

24

nature of the dismissal, the issue of plaintiff's request for leave to amend the complaint would have been addressed and clarified in the record.

¶ 62    The circuit court's questions and discussion of its common practice raise questions as to whether the circuit court even considered plaintiff's request to amend the complaint at the motion to dismiss hearing. Moreover, the record is silent as to whether the trial court ruled on this request. The dismissal order does not reference it, and the circuit court did not address it orally during the hearing. It therefore appears to us that the circuit court did not regard plaintiff's counsel's oral request as a motion for leave to amend, and accordingly, never exercised any discretion in ruling on this request prior to dismissing this case with prejudice.

¶ 63    In addition to the prejudgment request for leave to amend the complaint, we observe that following the issuance of the dismissal order, plaintiff reiterated her request for leave to amend contemporaneous with a motion to reconsider the dismissal order. Plaintiff attached to the motion a proposed SAC outlining the physical, emotional, and psychological injuries plaintiff sustained at defendant's facility, as well as including new allegations to support her claims for punitive damages and injunctive relief. The proposed SAC further alleged how defendant intentionally manipulated staffing records to conceal the extent of its understaffing—from regulators, from families, and from the public—by directing managers to verbally send hourly workers home upon arrival to the facility (before clocking in), creating the illusion that staffing shortages were due to no-shows rather than deliberate cost-cutting. The proposed SAC includes facts that plaintiff was frequently denied help using the bathroom and was left in her own urine and feces for hours at a time. As a result, she allegedly contracted UTIs, which caused her "intense and serious pain," including "a burning feeling when she urinated," abdominal and pelvic pain, and constant discomfort. These alleged painful infections, along with the experience of being left in her own

25

waste, allegedly caused plaintiff to suffer severe emotional distress and mental anguish, including "fear, sadness, depression, anxiety, embarrassment, and shame."

¶ 64    Plaintiff added details to the SAC regarding the IDPH's findings. For instance, she added: "Based on observation, interview and record review the Facility failed to ensure there was ample staff to resident ratios in order to provide dignity and respect to residents residing in the Facility. This has the potential to affect all residents residing in the Facility." Another paragraph that was added stated, "According to the report, one staff member confessed to the IDPH, 'when we are short staffed, with only one person to a hall, we just do the best we can. It is not doable with one person per hall … We always have call offs on the weekends, so those papers [staff assignment sheets] are not accurate. I have worked by myself and had 28 residents.' *** Another staff member stated, 'One CNA a hall is not acceptable on day or evening shift. That is when people are not taken care of.' '' Plaintiff moved some supporting facts from the exhibit that was attached to the original complaint into the body of the proposed SAC, as well as included more details regarding her injuries. The SAC addressed the issues that the circuit court had concerning plaintiff's allegations of injury and standing, as discussed during the motion to dismiss hearing.

¶ 65    Before a judgment is issued, the circuit court possesses broad discretion in deciding whether to grant leave to amend a complaint. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). However, "[w]here a complaint is dismissed with prejudice and does not include a statement allowing the plaintiff leave to amend, an involuntary dismissal order is final." *Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 332 (2008). "Once judgment is entered in the circuit court, there is no right to amend a complaint for purposes other than to conform the pleadings to the proof." *Folkers v. Drott Manufacturing Co.*, 152 Ill. App. 3d 58, 67

26

(1987). Nonetheless, we reiterate that this marked the second occasion on which plaintiff sought leave to amend the complaint, the initial request having been made prior to judgment.

¶ 66    In the present case, the record is silent as to whether the circuit court ever considered plaintiff's prejudgment oral motion to amend. No valid reason was furnished by the circuit court as to why plaintiff was not afforded an opportunity to rectify the deficiencies in the complaint. A circuit court's authority to allow amendments should be freely exercised in order that litigants may fully present their causes of action. *Scala/O'Brien Porsche Audi, Inc. v. Volkswagen of America, Inc.*, 87 Ill. App. 3d 757, 762 (1980). Accordingly, we conclude that the circuit court's failure to address plaintiff's oral motion to amend the complaint warrants reversal of the dismissal order and that the cause should be remanded with directions that the circuit court address that motion, along with the subsequent written motion for leave to amend and the proposed SAC. On remand, the circuit court is required to exercise its discretion after consideration of the factors outlined in *Loyola Academy*, 146 Ill. 2d at 273.

¶ 67                    2. *Immunity Under the Political Question Doctrine*

¶ 68    In addition to dismissal under section 2-619 based on lack of standing, the circuit court dismissed the complaint based on its belief that defendant was immune from suit pursuant to the political question doctrine. However, because we are reversing and remanding this matter as previously discussed, we need not address this issue.

¶ 69                    C. Section 2-615 Dismissal

¶ 70    In addition to dismissing the matter pursuant to section 2-619, the circuit court dismissed the matter with prejudice pursuant to section 2-615. A motion to dismiss under section 2-615 tests the legal sufficiency of the complaint based upon defects apparent on its face. *Reynolds v. Jimmy John's Enterprises*, *LLC*, 2013 IL App (4th) 120139, ¶ 25. A section 2-615 motion presents the

question of "whether the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, and taking all well-pleaded facts and all reasonable inferences that may be drawn from those facts as true, are sufficient to state a cause of action upon which relief may be granted." *Id.* " '[A] cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that *no set of facts* can be proved that would entitle the plaintiff to recovery.' " (Emphasis added.) *Id.* (quoting *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006)). In ruling on a section 2-615 motion, a court considers only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record. *Id.* An order granting a section 2-615 motion to dismiss is reviewed *de novo*. *Id.*

¶ 71    As we are reversing the dismissal order and remanding this case for the reasons previously explained, we will only briefly address the trial court's rulings on the section 2-615 aspect of the motion. The circuit court dismissed the complaint pursuant to section 2-615 because (1) plaintiff failed to state a claim for violations of the NHCA and ICFA because she had not alleged any injury; (2) plaintiff did not allege unfair practice or deceptive conduct on the part of defendant; (3) plaintiff failed to state a claim for breach of contract; and (4) plaintiff failed to state a claim for unjust enrichment. Plaintiff was given no opportunity to amend the complaint to correct any pleading deficiencies in those counts.

¶ 72    "While the granting of a section 2-615 motion is within the sound discretion of the trial court, where a complaint does not allege a cause of action properly, the general course is to allow leave liberally to amend rather than to dismiss a claim with prejudice." *Roy v. Coyne*, 259 Ill. App. 3d 269, 274 (1994). "[A] cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Marshall*, 222 Ill. 2d at 429.

28

¶ 73 Here, the circuit court provided plaintiff no opportunity to replead, and there were no prior substantive amendments to the complaint. As discussed above, the plaintiff sought leave to amend the complaint during the hearing, which the circuit court never addressed, and then filed a proposed second amended complaint in an effort to cure any pleading deficiencies. The established principle of liberally allowing leave to amend a complaint was simply not followed in this matter. As a result, we vacate the denial of the motion to reconsider and motion to amend, as well as the dismissal with prejudice, and remand to the circuit court for further proceedings. On remand, the circuit court is directed to exercise its discretion in considering whether to permit plaintiff to amend all counts of the complaint consistent with the foregoing authorities.

¶ 74                                  D. Arbitration Agreement

¶ 75 Defendant cross-appeals the circuit court's denial of its motion to compel arbitration. The circuit court denied defendant's motion to compel arbitration on a nonevidentiary basis, finding that plaintiff's husband did not have authority to sign the agreement and that the arbitration agreement was substantively unconscionable. "When the circuit court has not held an evidentiary hearing on a motion to compel arbitration, we review the court's ruling *de novo*." *Mulligan v. Loft Rehabilitation & Nursing of Canton*, *LLC*, 2023 IL App (4th) 230187, ¶ 17.

¶ 76 "The FAA reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67-68 (2010). Section 2 of the Federal Arbitration Act (FAA) (9 U.S.C. § 1 *et seq.* (2012)) states in part, "A written provision in *** a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract *** shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract ***." *Id.* § 2. "The FAA thereby places arbitration agreements on an equal footing with other contracts [citation] and

29

requires courts to enforce them according to their terms [citation]. Like other contracts, however, they may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.' " *Rent-A-Center*, 561 U.S. at 67-68 (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). It is well settled that where a dispute concerns the formation of a contract, the dispute is generally for the court to decide. *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010). State law principles of contract formation determine whether a contract exists between the parties. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Peterson v. Devita*, 2023 IL App (1st) 230356, ¶ 22.

¶ 77    "When presented with a motion to compel arbitration under section 3 of the Federal Arbitration Act (FAA) (9 U.S.C. § 3 (2012)), the trial court's inquiry is limited to certain gateway matters, such as whether the parties have a valid written agreement to arbitrate at all, and if so, whether the issues in dispute fall within the scope of the arbitration agreement." *Sturgill v. Santander Consumer USA, Inc.*, 2016 IL App (5th) 140380, ¶ 22. A court should order arbitration " 'only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.' " (Emphasis in original.) *Peterson*, 2023 IL App (1st) 230356, ¶ 22 (quoting *Granite Rock*, 561 U.S. at 299). "The party seeking to compel arbitration has the burden to establish that the parties have a valid agreement to arbitrate and that the controversy falls within the scope of the arbitration provision." *Sturgill*, 2016 IL App (5th) 140380, ¶ 22.

¶ 78    Although not entirely clear, defendant appears to contend that the circuit court lacked authority to determine the threshold issue of whether an agreement to arbitrate was formed between

the parties. For the reasons articulated below, we find that the circuit court appropriately retained authority to determine whether an arbitration agreement was formed.

¶ 79    The arbitration document in this case provides in part:

"2. The disputes subject to arbitration in accordance with this Arbitration Agreement, include:

a) all claims or controversies arising out of or in any way relating to the Residency Contract, but not involuntary transfer and discharge proceedings, eviction proceedings, or matters that are properly filed in a small claims court or with the Illinois Department of Public Health ('IDPH');

b) the Resident's stay at Facility, but not administrative involuntary termination or involuntary transfer or discharge proceedings, eviction proceedings, or matters that are properly filed in a small claims court or with IDPH;

c) the services rendered for any condition, and any dispute arising out of the diagnosis, treatment, or care of the Resident;

d) disputes involving amounts in controversy greater than $150,000.00; or

e) disputes regarding interpretation of this Arbitration Agreement.

* * *

4. This Arbitration Agreement shall be governed by and interpreted under the Federal Arbitration Act ('FAA'), 9 U.S.C. 1-16."

¶ 80    First, although paragraph four of the arbitration document states that the rules governing the document are controlled by the FAA, it is the court that decides, initially, "the question of arbitrability." *Hollingshead v. A.G. Edwards & Sons, Inc.*, 396 Ill. App. 3d 1095, 1099 (2009). In this regard, the question of arbitrability is decided under the substantive law of the FAA, but because this case was filed in the circuit court of Illinois, the court proceedings are governed in accordance with the Illinois rules of procedure, including the procedures set forth in section 2(a) of the Uniform Arbitration Act (Uniform Act) (710 ILCS 5/2(a) (West 2022)). See *Comdisco, Inc. v. Dun & Bradstreet Corp.*, 285 Ill. App. 3d 796 (1996). Section 2(a) of the Uniform Act states, in pertinent part, that if an opposing party denies the existence of an arbitration agreement, the court

31

"shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied." 710 ILCS 5/2(a) (West 2022). "The directive to 'proceed summarily' has been interpreted as a directive to conduct a summary proceeding." *Sturgill*, 2016 IL App (5th) 140380, ¶ 25. "A summary proceeding may be defined, generally, as ' "a civil or criminal proceeding in the nature of a trial conducted without the formalities (as indictment, pleadings, and a jury) *** and used for the speedy and peremptory disposition of some minor matter." ' " *Id.* (quoting *Comdisco, Inc.*, 285 Ill. App. 3d at 801, quoting Webster's Third New International Dictionary 2289 (1986)). Therefore, when the circuit court is confronted with a motion to compel arbitration, it should proceed promptly and without a jury trial to make a substantive determination regarding the existence of a valid arbitration agreement. *Id.* This is precisely what occurred here. The circuit court heard arguments of counsel and then summarily determined that there was no valid arbitration agreement between the parties.

¶ 81    "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." (Internal quotation marks omitted.) *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). In this instance, the parties did not clearly stipulate that the issue of the formation of the arbitration agreement would be governed by the American Arbitration Association (AAA). Defendant's reliance on paragraphs (B)(2)(e) and (B)(7) to support the assertion that this issue has been delegated to the arbitrator is misplaced. First, paragraph (B)(2)(e) delegates disputes concerning the *interpretation* of the arbitration agreement, rather than its *formation*. Second, paragraph (B)(7) states that the AAA rules govern the arbitration proceedings themselves, and not the court proceedings concerning the formation of the agreement. Neither of

32

the delegation provisions cited by defendant specifically indicates that enforceability or unconscionability issues are to be governed by the AAA rules or are subject to arbitration.

¶ 82 Defendant further implies that the circuit court was required to delegate to the arbitrator any issue as to the formation of the arbitration agreement, citing the United States Supreme Court's decision in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), and an unpublished Rule 23 order out of our district—*Rotan v. Unlimited Development, Inc.*, 2023 IL App (5th) 220182-U. However, both cases are distinguishable from the case at bar.

¶ 83 First, in *Rent-A-Center*, the issue before the Court was whether, under the FAA, a district court could determine whether an arbitration agreement is unconscionable when the agreement explicitly provides that the decision is up to the arbitrator. 561 U.S. at 65. The arbitration agreement in *Rent-A-Center* provided for arbitration of all " 'past, present or future' " disputes arising out of the plaintiff's employment with Rent-A-Center, including " 'claims for discrimination' " and " 'claims for violation of any federal … law.' " *Id.* at 65-66. It also provided that " '[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.' " *Id.* at 66. The issue between the parties was whether the arbitration agreement was unconscionable. *Id.* Because the plaintiff did not specifically challenge the delegation provision but instead contested the agreement in its entirety, the Court determined that the arbitrator had exclusive authority to resolve the agreement's enforceability under the specified provisions. *Id.* at 72.

¶ 84 *Rent-A-Center* is distinguishable from the present case due to a key difference: the delegation provision in *Rent-A-Center* was explicit. It explicitly stated that the arbitrator " 'shall

33

have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.' " *Id.* at 66. Conversely, in this instance, the arbitration agreement did not include the terms "enforceability" or "formation." Whether the arbitration document constitutes an agreement that was indeed formed between the parties falls outside the scope of any arbitration delegation provision, and thus, such a determination lies appropriately with the circuit court.

¶ 85    In *Rotan v. Unlimited Development, Inc.*, 2023 IL App (5th) 220182-U, ¶ 47, this court reversed the trial court's decision denying the motion to compel arbitration. The plaintiff in that case did not claim unconscionability or any contract defense but rather argued that the trial court had the authority to determine arbitrability under the AAA rules incorporated therein. *Id.* ¶¶ 19, 36. As a result, we held that the agreement delegated to the arbitrator any dispute as to the scope of the arbitration clause. *Id.* ¶¶ 36-37.

¶ 86    *Rotan* is factually distinguishable from the present case in a significant aspect—in *Rotan*, there was no dispute that the arbitration agreement was formed, nor that the parties entered into an arbitration agreement. In other words, the plaintiff in that matter did not raise any contract defense. In the current matter, however, there is a dispute regarding the formation of an arbitration agreement between the parties and, if it was properly formed, whether it was unconscionable.

¶ 87    A court should order arbitration only when it is satisfied that the formation of the parties' arbitration agreement is not in dispute. *Peterson*, 2023 IL App (1st) 230356, ¶ 22. Here, the threshold question is whether plaintiff ever formed an agreement with defendant to arbitrate. If no agreement to arbitrate was ever formed, then the parties could not have clearly and unmistakably provided that any matter is delegated to an arbitrator. Consequently, the circuit court correctly

34

retained the authority to address the issues of whether an arbitration agreement was formed between the parties and whether the agreement was unconscionable if it was properly formed.

¶ 88                                    1. *Agreement Formation*

¶ 89     We now proceed to examine the circuit court's determination that no arbitration agreement was formed between the parties. In this instance, plaintiff did not personally sign the arbitration document; instead, it was signed by her husband. Plaintiff asserts that her husband lacked the authority to sign the document, thereby rendering the arbitration agreement unenforceable. In response, defendant contends that even if plaintiff did not sign the document, she is nevertheless bound by it "through her subsequent actions." In other words, defendant argues that the doctrine of ratification obligates the plaintiff to the arbitration agreement.

¶ 90     "Whether a nonsignatory party is bound to an arbitration agreement is dictated by the ordinary principles of contract and agency." *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 891 (2010). "The spouse's signature on an arbitration agreement may bind a nursing home resident if the spouse has the authority to sign the document as the resident's agent." *Id.* The status of the parties as husband and wife, by itself, does not establish an agency relationship. *Id.* "The party claiming an agency relationship must prove it by a preponderance of the evidence." *Id.* at 892.

¶ 91     Defendant asserts that plaintiff is bound by her husband's actions through the doctrine of ratification. "Ratification is a form of equitable estoppel involving the express or implied adoption of the acts of another by one for whom the other assumes to be acting, even without authority." *Swader v. Golden Rule Insurance Co.*, 203 Ill. App. 3d 697, 704 (1990). Central to the doctrine of ratification is the principle that the individual ratifying accrues a benefit, which is derived from the actions of a person acting on their behalf with apparent or implied authority. *Id.* Here, defendant did not bring forth any factual evidence in the form of affidavits or deposition testimony to support

35

a finding by the circuit court that plaintiff's husband acted with apparent or implied authority, or to support its theory of ratification. Furthermore, defendant has not presented any argument on appeal to substantiate a finding of apparent or implied authority; consequently, we shall not consider it.

¶ 92    Defendant also attempts to invoke a provision contained in the NHCA for its contention that plaintiff's husband's signature bound plaintiff to the arbitration agreement. More specifically, it relies on section 2-202(a) of the NHCA, which states in part:

> "Before a person is admitted to a facility, or at the expiration of the period of previous contract, or when the source of payment for the resident's care changes from private to public funds or from public to private funds, a written contract shall be executed between a licensee and the following in order of priority:
>
> > (1) the person, or if the person is a minor, his parent or guardian; or
> >
> > (2) the person's guardian, if any, or agent, if any, as defined in Section 2-3 of the Illinois Power of Attorney Act; or
> >
> > (3) a member of the person's immediate family." 210 ILCS 45/2-202(a) (West 2022).

¶ 93    Defendant contends that section 2-202 permits a resident's immediate family member to execute a contract necessarily implies that the family member is also authorized to sign the arbitration agreement. We disagree. If the legislature had intended to grant the family member the authority to sign documents beyond the scope of the contract, it would have explicitly specified that authority. "Unless omitted through legislative oversight, we are not permitted to add words to a statute that have not been included." *Thompson Electronics Co. v. Easter Owens/Integrated Systems, Inc.*, 301 Ill. App. 3d 203, 207 (1998).

36

¶ 94    Furthermore, Illinois courts have consistently rejected nursing home arbitration agreements when such agreements are signed by family members who lack the necessary authority. In the case of *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 892-96 (2010), it was determined that the wife's signature on admission documents did not bind her husband to arbitration, as she lacked power of attorney and he did not authorize her to sign the arbitration agreement. In *Nelson v. Heartland of Galesburg IL, LLC*, 2019 IL App (3d) 180103-U, ¶¶ 23-24, the court held that the husband lacked authority to act as his wife's agent, finding no evidence of express authority—such as her signing written agreements, executing a power of attorney, or a court order granting such authority—and no implied authority, since the wife was neither present during the signing nor aware of it. The court also concluded there was no apparent authority. *Id.* ¶ 29. Consequently, the court ruled that the husband lacked authority to sign the arbitration agreement on his wife's behalf as her agent. *Id.* ¶ 30 Lastly, in *Daley v. Alden-Town Manor Rehabilitation & Health Care Center, Inc.*, 2022 IL App (1st) 211619-U, ¶ 36, the court found that the resident's son lacked the authority to consent to arbitration without a power of attorney, rendering the agreement void. Each of these cases bears factual similarity to the present case.

¶ 95    Finally, we note briefly that the arbitration document in question was entirely uncompleted. The initial paragraph, intended to identify the parties to the agreement, is completely blank. There is no indication whatsoever of the resident's identity or the facility's identity. Furthermore, the date is absent. Lastly, the resident's name is entirely omitted from the signature lines at the conclusion of the document.

¶ 96    Defendant did not meet its burden of proof under any theory to establish that plaintiff is bound by the arbitration agreement. Furthermore, defendant's attempt to invoke the NHCA as a basis for authorizing plaintiff's husband to sign the arbitration document on behalf of plaintiff is

37

misplaced. Consequently, we agree with the decision of the circuit court that defendant did not establish a binding or enforceable arbitration agreement with plaintiff.

¶ 97                                    2. *Unconscionability*

¶ 98     In addition to finding that the arbitration agreement was not properly executed, the circuit court found the arbitration agreement substantively unconscionable. "[S]tate law contract defenses may invalidate an arbitration agreement, including fraud, duress, or unconscionability." *Turner v. Concord Nursing & Rehabilitation Center, LLC*, 2023 IL App (1st) 221721, ¶ 20. More specifically, the circuit court determined that the clause limiting damages to "actual out-of-pocket costs actually incurred plus an amount not to exceed $250,000 for any and all other damages" is substantively unconscionable. Additionally, the agreement barred recovery of punitive damages. We initially note that defendant failed to raise or argue that the circuit court's finding of unconscionability was in error. "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Nevertheless, we will address the circuit court's finding and, for the following reasons, we agree.

¶ 99     A contract is deemed unconscionable when it is "improvident, oppressive, or totally one-sided." *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191 (1983). "Procedural unconscionability exists when, after considering all of the circumstances, a court determines that disputed contract terms were 'so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware [he or she] was agreeing to [them]' and that the plaintiff lacked bargaining power." *Turner*, 2023 IL App (1st) 221721, ¶ 20 (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006)). "Substantive unconscionability applies where the contract terms are so one-sided that they oppress or unfairly surprise an innocent party and create an overall imbalance in the obligations and rights imposed by the bargain and a significant cost-price

38

disparity." *Id.* A contract or clause may be declared unenforceable on the grounds of procedural or substantive unconscionability, or a combination of the two. *Id.*

¶ 100   In *Turner v. Concord Nursing & Rehabilitation Center*, *LLC*, 2023 IL App (1st) 221721, ¶ 35, certain terms contained in an arbitration agreement were identical to those in the present case, namely, they limited out-of-pocket costs to $250,000 and barred punitive damages. The appellate court noted that one of the counts of the complaint was brought pursuant to the NHCA. *Id.* It pointed out that section 3-602 provides " '[t]he licensee shall pay the actual damages and costs and attorney's fees to a facility resident whose rights *** are violated.' " *Id.* ¶ 28 (quoting 210 ILCS 45/3-602 (West 2020)). It stated, "Although the act does not mention punitive damages, our supreme court has held that plaintiffs who sue under the Nursing Home Care Act may ' "recover common law punitive damages upon proof of willful and wanton misconduct on the part of defendant." ' " *Id.* ¶ 35 (quoting *Vincent v. Alden-Park Strathmoor, Inc.*, 241 Ill. 2d 495, 502 (2011), quoting *Dardeen v. Heartland Manor, Inc.*, 186 Ill. 2d 291, 300 (1999)). The appellate court further noted that section 3-602 of the NHCA expressly states that residents may recover " 'actual damages and costs' " and attorney fees. *Id.* (quoting 210 ILCS 45/3-602 (West 2020)). The appellate court found that limiting the plaintiff to $250,000 in damages and prohibiting an arbitrator from awarding him attorney fees contravenes Illinois law and rendered the arbitration agreement substantively unconscionable. *Id.*

¶ 101   Similarly, in *Hwang v. Pathway LaGrange Property Owner*, *LLC*, 2024 IL App (1st) 240534, ¶ 25, the appellate court found that the one-sided nature of the arbitration agreement, the confidentiality clause, the provision prohibiting punitive damages, the provision capping damages at $250,000, and the plaintiff's lack of bargaining power when signing the agreement made the arbitration agreement substantively unconscionable and, therefore, unenforceable. "A contract will

39

be found substantively unconscionable where its 'terms are so one-sided that they oppress or unfairly surprise an innocent party,' when there is 'an overall imbalance in the obligations and rights imposed by the bargain,' or when a 'significant cost-price disparity' exists." *Id.* ¶ 16 (quoting *Turner*, 2023 IL App (1st) 221721, ¶ 20). "When examining the substantive provisions of an arbitration agreement, courts are more likely to find unconscionability when a consumer is involved and has 'no hand in [the] drafting' of the agreement, when there is a disparity in bargaining power, and when the agreement is on a preprinted form." *Id.* (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006)).

¶ 102   The arbitration agreement in this case, similar to that in *Turner*, restricts plaintiff's damages to a maximum of $250,000, limits recovery of attorney fees to $5,000, and prohibits punitive damages. Similar to *Hwang*, the arbitration agreement is unilateral, as it excludes actions for involuntary transfer, discharge, or eviction, and is presented on a preprinted form. Plaintiff had no opportunity to negotiate the terms, as she was unaware of the agreement upon admission; this includes the confidentiality clause, the provision prohibiting punitive damages, and the cap on damages at $250,000. As a result, we concur with the circuit court's determination that the arbitration agreement is substantially unconscionable and, consequently, unenforceable.

¶ 103                                III. CONCLUSION

¶ 104   For the foregoing reasons, we reverse the dismissal of the complaint with prejudice and remand for proper consideration of the amendment request; further, we affirm the circuit court's denial of the motion to compel arbitration.


¶ 105   Affirmed in part and reversed and remanded in part.